## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **SOLID WASTE SERVICES, INC.** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No. 08-327 (FSH)** |
| **v.** | : | |
| | : | |
| **MORRIS COUNTY MUNICIPAL** | : | **REPORT AND RECOMMENDATION** |
| **UTILITIES AUTHORITY, et al.** | : | |
| | : | |
| **Defendants.** | : | |

## I. INTRODUCTION

This matter is before the Court on the parties' cross-motions for summary judgment pursuant to Fed. R. Civ. P. 56.  The Honorable Faith S. Hochberg referred these motions to the Undersigned for a Report and Recommendation.  For the reasons set forth herein, the Undersigned recommends that Her Honor grant the defendants' motions for summary judgment and deny plaintiff's motion for summary judgment.  The Court decided these motions without oral argument pursuant to Fed. R. Civ. P. 78 and Local Civ. R. 78.1.

## II. STANDARD

Pursuant to Rule 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Stated differently, "[s]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  Miller v. Indiana Hosp., 843

F.2d 139, 143 (3d Cir. 1988).  An issue is "material" only if the dispute over facts "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  If the record taken as a whole in a light most favorable to the nonmoving party "could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).  If the evidence for the nonmoving party is "merely colorable" or "is not significantly probative," then summary judgment may be granted.  See Anderson, 477 U.S. at 249-50.  Thus, "[t]he question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of the evidence required by governing law *or* that he did not." Id. at 254 (emphasis in original).  Here, the material facts are undisputed and, for the reasons set forth herein, no rational fact finder could find plaintiff could prove its case.

## III. STATEMENT OF FACTS

The Morris County Municipal Utilities Authority ("MCMUA") is a public body established pursuant to the Municipal and County Utilities Authorities Law, N.J.S.A. 40:14B-1, et seq.,  Parties' Joint Statement of Undisputed Material Facts, May 8, 2008 at 1 ("JSUF"). MCMUA contracts the operation of solid waste transfer stations and waste disposal via competitive public bids obtained under the New Jersey Local Public Contracts Law, N.J.S.A. 40:11-1, et seq.  Id. at 2.

Defendant Waste Management, Inc. ("Waste Management") provided these services to the MCMUA pursuant to a five-year contract that concluded on January 27, 2008.  JSUF at ¶6. On October 15, 2007, the MCMUA announced that it was accepting bids for performing the

waste transfer operations for a five-year period beginning "on or about January 28, 2008," and

issued Bid Specifications.  Id. at 2; Stip. Ex. No. 1 at IB-2.  The Bid Specifications requested

each prospective bidder to bid on at least one of four alternatives[1] and the MCMUA "reserve[d]

the right to select [the] alternate that is in the best interest of the MCMUA and award a contract

to the lowest responsible bidder for that alternate."  Stip. Ex. No. 1.  The MCMUA also issued

two bid addendums on December 5, 2007 and December 7, 2007.  Stip. Ex. Nos. 6-7.  The

December 5, 2007 addendum adjusted, among other things, the due date of the bids, Consent of

Surety, and the "Landfill Facility Questionnaire."  Stip. Ex. No. 6 at Add 2, 5-6.  The December

---

[1] Defendant MCMUA summarized the bid alternative as followed:

> "Alternate A" was for the operation of the [MCMUA's] transfer
> stations and the transportation of solid waste from the transfer
> stations via over-the-road transfer trailers to disposal facilities
> designated by the bidder for a period of 5 years.

> "Alternate B" is identical to Alternate A, with the exception that
> the term of the contract would be for a period of 2 years, together
> with three (3) one year extensions of the contract that could be
> exercised in the [MCMUA's] discretion.

> "Alternate C" provided for the operation of the [MCMUA's]
> transfer stations, and the transportation of solid waste from the
> transfer stations to disposal facilities identified by the bidder for a
> period of 5 years.  The transportation component of this alternate,
> however, envisioned the eventual utilization of intermodal rail
> facilities to transport the solid waste from the [Parsippany-Troy]
> Transfer Station to final disposal facilities.

> "Alternate D" is identical to Alternate C, with the exception that
> the transportation component of this alternate envisioned the
> eventual utilization of intermodal rail facilities to transport the
> solid waste from both of the [MCMUA's] [t]ransfer [s]tations to
> final disposal facilities.

MCMUA Br. at 4-5 (internal citations omitted); Stip. Ex. No. 1 at IB 4-5.

7, 2007 addendum clarified the number of landfills about which information was sought.  Stip. Ex. No. 7.  On December 18, 2007, Solid Waste Services, Inc. d/b/a J.P. Mascaro & Sons ("Mascaro" or "Plaintiff"), defendant Waste Management, and a non-party to this suit, Veolia Environmental Services Solid Waste of New Jersey, Inc., submitted bids.  JSUF at ¶ 12.  In accordance with the December 5, 2007 bid addendum, on December 18, 2007 at 2:00 P.M., the MCMUA publicly opened the bids.  Id. at ¶ 11.

On December 20, 2007, plaintiff sent a letter to the MCMUA asserting that Waste Management's bid was defective because it: (1) failed to demonstrate the mandatory minimum disposal capacity; (2) failed to submit a mandatory Questionnaire with responses from its subcontractors; (3) contained an invalid Consent of Surety; and (4) failed to provide a required certificate of registration under the Public Works Contracts Registration Act.  Stip. Ex. Nos. 9, 11-12.

On January 7, 2008, Waste Management sent a letter to MCMUA responding to plaintiff's objections to Waste Management's bid.  Stip. Ex. No. 14.  It asserted that: (1) the MCMUA reserved the right to request and consider any additional information submitted by a bidder;[2] (2) plaintiff misread the subcontractor questionnaire requirement because the bid requirements require answers to be submitted jointly by the Bidder and proposed subcontractors and Waste Management's completed Questionnaire complies with the requirement; (3) the Surety Disclosure Statement in Waste Management's bid sets forth only the bonds Safeco can solely issue and Safeco may issue bonds in excess of the amount if it is reinsured; and (4) a

---

[2] In response to a request concerning its bid, Waste Management submitted additional information on January 8, 2008.  Stip. Ex. No. 15.

Public Works Contracts Registration may be submitted any time before the award of the contract and Waste Management submitted one with the January 7, 2008 letter.  Stip. Ex. Nos. 14, 15.  In addition, with respect to the surety issue, on January 4, 2008, Safeco Insurance, Waste Management's surety, sent a letter to the MCMUA stating that Safeco is "willing and able" to provide Waste Management a final bond of $206,000,000 with a combined treasury limit of $280,271,000.  Stip. Ex. No. 13.  Safeco indicated in its letter that Safeco had a treasury limit of $115,540,000 with the remaining $164,729,000 provided by General Insurance Company of America and American States Insurance Company.  Id.  On January 8, 2008, Mascaro submitted a memorandum of law to the MCMUA requesting it to refrain from a re-bid as a violation of law and award the contract to plaintiff.  Stip. Ex. No. 12.

On January 8, 2008, the MCMUA advised plaintiff that the MCMUA had consulted Joseph J. Maraziti, Esq., to advise the Chairman on the award.  Stip. Ex. No. 16.  On January 8, 2008, Mr. Maraziti submitted a letter to the MCMUA concluding that Waste Management's bid was not defective because: (1) as to landfill disposal capacity, Waste Management disclosed the maximum daily tonnage permitted at each landfill and these maximums exceed the 500,000 tons requested in the bid and MCMUA may waive the incomplete response to one of the questions on this topic, Stip. Ex. No. 17 at 2; (2) as to the Questionnaire, only certain questions refer to subcontractors and Waste Management provided "information for at least one of its transportation subcontracts " and, "although not required, further information was provided . . ., which remains on file,"  id. at 3; (3) as to the surety's ability to guarantee performance, although "a material and non-waivable requirement," "[t]he power of attorney granted to [the Attorney-in-Fact for Safeco] is on behalf of *both* [Safeco] and General Insurance Company of America," and

"the combined treasury limits exceed the estimate contract amount," id. at 3-4 (emphasis in original).

The MCMUA announced that it would hold public hearings on January 8, 2008 regarding the disputes about Waste Management's bid.  See Stip. Ex. No. 14.  Mascaro sent a letter to the MCMUA notifying it of Mascaro's intent to attend and be heard at the hearing.  Stip. Ex. No. 12. Based on Mr. Maraziti's letter and the submissions of Waste Mangement and Plaintiff, the MCMUA passed Resolution No. 08-05 on January 8, 2008 authorizing the Executive Director to enter a contract with Waste Management on bid Alternate A.  Stip. Ex. No. 19.  On January 9, 2008, the waste transfer operations contract was executed between the MCMUA and Waste Management and Safeco issued a "Form of Performance and Payment Bond" with MCMUA for $190,290,000.  Stip. Ex. Nos. 21-22.  On January 25, 2008, the MCMUA issued Waste Management a notice to proceed with the contract.  Stip. Ex. No. 25.

On January 17, 2008, plaintiff filed a Complaint seeking to set aside the contract award to Waste Management and enjoin Waste Management's performance of the contract, remand back to MCMUA for consideration, and require Waste Management to continue operating under the previous contract until MCMUA takes action upon the remaining bids.  Docket Entry No. 1.  On June 18, 2008, the Honorable Faith S. Hochberg denied plaintiff's motion for preliminary injunction.  Docket Entry No. 95.  Her Honor found that:  (1) plaintiff failed to show irreparable harm due to Waste Management's continued performance or future irreparable harm if the Court postpones a decision on the merits until summary judgment; and alternatively (2) plaintiff has failed to show "the public interest favors such relief" as "[t]he health and safety of the citizens of Morris County weigh heavily in favor of avoiding any potential disruption" of waste disposal

service and the "price difference between [p]laintiff's bid and [Waste Management's] bid . . . . would be borne by the citizens of Morris county." Id. at 3-4.

On May 16, 2008, plaintiff filed a motion for summary judgment. Docket Entry No. 81. On June 6, 2008, defendant MCMUA filed a cross-motion for summary judgment and a brief in opposition to plaintiff's motion for summary judgment. Docket Entry No. 88 ("MCMUA Br."). On June 9, 2008, defendant Waste Management filed a brief in support of MCMUA's cross-motion for summary judgment. Docket Entry No. 91 ("Waste Mgmt. Br.").

On June 16, 2008, plaintiff filed an opposition to defendants' motion for summary judgment and a reply brief in further support of plaintiff's motion for summary judgment. Docket Entry No. 92 . On July 1, 2008, defendant MCMUA filed a reply brief in further support of its cross-motion for summary judgment. Docket Entry No. 99. On July 14, 2008, Waste Management filed a reply brief in further support of its cross-motion for summary judgment. Docket Entry No. 101.

Although the MCMUA's bid requirements have numerous components, plaintiff challenges only three aspects of Waste Management's bid, specifically that Waste Management allegedly failed to: (1) submit a sufficient Consent of Surety, Pl. Br. at 23, (2) identify the "anticipated tonnage of MCMUA waste that will be disposed of at each [of its landfill or disposal] facility," id. at 11; and (3) submit Questionnaires from its proposed subcontractors that show each had, on at least one prior occasion, transported solid waste with an average daily tonnage of at least one thousand tons per day between two validly permitted disposal facilities. Id. at 34.

As to the Consent of Surety, plaintiff asserts Waste Management's bid does not meet the Consent of Surety and performance bond requirements.  The relevant MCMUA bid specification states that:

> [t]he execution of the Contract is contingent upon the furnishing of an executed Performance and Payment Bond . . . for the full term of the Contract, in an amount equal to no more than 100 percent of the value of the Contract for five years . . . .
>
> The Performance and Payment Bond shall be conditioned on the faithful performance of the Contract as required by statute.  The Bond shall be of the form included in the Bid Documents.

Stip. Ex. No. 1 at IB 2-3.  The Bid forms included a Consent of Surety and a Surety Disclosure Statement and Certificate.  The latter requested information about the underwriting limitation of each surety participating in the issuance of the Performance Bond.  Id. at SU-3.  Waste Management submitted both a Consent of Surety and the Surety Disclosure Statement and Certificate, but the plaintiff contends that differences between the two documents renders Waste Management's bid defective.  Pl. Br. at 24.

As to the challenge to the information about Waste Management's landfill access, the MCMUA specification required that each bidder complete a Landfill Questionnaire.  The relevant portion of the bid specification stated that "[i]n order to be qualified to be considered for the Award of the Contract . . . [e]ach Disposal Facility used to meet [the] requirement, including each Landfill, Resource Recovery Facility, and Transfer Station must provide a completed survey form . . . ."  Stip. Ex. No. 1 at IB-9.  The questionnaire sought information to determine if the bidder could meet that specification that required at a minimum that each bidder show that it has the capacity to dispose of 2500 tons of waste per day and 500,000 tons per year at disposal facilities identified in the bid.  The specification allowed each bidder to identify up to five land

fill facilities that would accept such waste and required identification of at least two disposal

facilities.  Id., amended by Addendum 1. The "Landfill Facility Questionnaire" contains

instructions that tell the bidder to complete a Questionnaire for each landfill a bidder proposes to

use and states that "[a]n incomplete [answer] to a question may result in a bid being

nonresponsive."  Stip. Ex. No. 1, Landfill Facility Questionnaire (emphasis added).

Questions Nos. 12(a) and 12(b) of the Landfill Questionnaire asked for the average

amounts of waste each facility had the capacity to accept and the amounts of Morris County

waste the bidder expected to be delivered to the particular site.  The question reads:

> 12.  Please Identify . . .
>
> a. The maximum and average daily permitted quantities (in tons) of solid waste that the facility can accept:
>
> Permitted Maximum Daily tons_____
>
> Permitted Average Daily Tons_____
>
> b. Anticipated tonnage of the estimated 430,000 tons generated annually in Morris County that will be disposed at this facility (NOTE: Sum of the waste to be disposed by a Bidder must total 430,000 tons.  This tonnage can be received by one, two, three, four or five Disposal Facilities.)
>
> Annual Tonnage at Disposal Facility _____
>
> Permitted Maximum Daily Tons _____
>
> Permitted Average Daily Tons _____

Id.  The December 5, 2007 Bid Addendum increased the required total tonnage from 430,000 to

500,000.  Stip. Ex. No. 6 at Add-7.  Waste Management provided a response to Question No.

12(a) but did not provide a response to Question No. 12(b). Stip. Ex. No. 8 at 10-22.

As to the third component plaintiff challenges, plaintiff asserts that Waste Management

failed to have each of its subcontractors demonstrate that, on at least one prior occasion, each had

"transported solid waste with an average daily tonnage of at least one thousand (1,000) tons per day between two validly permitted Disposal Facilities," or describe when it performed such transportation.  Stip. Ex. No. 1 at QS-5.  This information is sought on a separate Questionnaire that was part of the bid specifications.  According to the instructions, "[t]his questionnaire must be filled out and submitted by the Bidder and any proposed subcontractors as part of the Bid for MCMUA.  Failure to complete this form or to provide any of the information required herein shall result in rejection of the Bid."  Id. at QS-3.  (emphasis in original).

## IV. DISCUSSION

### A. Standard for Evaluating Alleged Bid Defects

The competitive-bidding process for public contracts is incorporated in the Local Public Contracts Law, see N.J.S.A. 40A:11-11.4, and requires that municipalities and counties advertise for bids on public contracts that exceed a specific statutory threshold amount.  Section 40A:11-4(a) provides that:

> [e]very contract awarded by the contracting agent for the provision or performance of any goods or services, the cost of which in the aggregate exceeds the bid threshold, shall be awarded only by resolution of the governing body of the contracting unit to the lowest responsible bidder after public advertising for bids and bidding therefor, except as is provided otherwise in this act or specifically by any other law.

N.J.S.A. 40A:11-4(a).   The purpose of the Local Public Contracts Law is to "secure for the public the benefits of unfettered competition," Meadowbrook Carting Co., Inc. v. Borough of Island Heights, 138 N.J. 307, 313 (1994) (quoting Terminal Constr. Corp. v. Atlantic County Sewerage Auth., 67 N.J. 403, 410 (1975)), promote competition on an equal footing, and guard

-10-

against "favoritism, improvidence, extravagance and corruption." <u>Twp. of Hillside v. Sternin</u>, 25 N.J. 317, 322 (1957); <u>see</u> <u>also</u> <u>L. Pucillo & Sons, Inc. v. Mayor and Council of New Milford</u>, 73 N.J. 349, 356 (1977).  Section 40A:11-4(a) requires that the contract must be awarded not simply to the lowest bidder, but rather to the lowest bidder who complies with the substantive and procedural requirements in the bid advertisements and specifications.  <u>Meadowbrook</u>, 138 N.J. at 313.   Strict compliance is required and the contracting authority generally is without discretion to accept a defective bid.  <u>See</u> <u>L. Pucillo</u>, 73 N.J. at 356.  Indeed, "material conditions contained in bidding specifications may not be waived."  <u>Terminal Constr.</u>, 67 N.J. at 411 (citing <u>Hillside</u>, 25 N.J. at 324).   Minor or inconsequential discrepancies and technical omissions, however, can be waived.  <u>Hillside</u>, 25 N.J. at 324.  Thus, if noncompliance with, or a deviation from the specification is discovered, the Court must then determine whether that noncompliance can be waived.  In explaining whether or not a condition may be waived, the New Jersey Supreme Court stated:

> Essentially this distinction between conditions that may or may not be waived stems from a recognition that there are certain requirements often incorporated in bidding specifications [that] by their nature may be relinquished without there being any possible frustration of the policies underlying competitive bidding.  In sharp contrast, advertised conditions whose waiver is capable of becoming a vehicle for corruption or favoritism, or capable of encouraging improvidence or extravagance, or likely to affect the amount of any bid or to influence any potential bidder to refrain from bidding, or which are capable of affecting the ability of the contracting unit to make bid comparisons, are the kind of conditions [that] may not under any circumstances be waived.

<u>Meadowbrook</u>, 138 N.J. at 314-15 (quoting <u>Terminal Constr.</u>, 67 N.J. at 412).  In short, contract specifications that are material cannot be waived.  <u>Id.</u> at 314.

To determine whether or not a condition is material, the Court must first consider "whether the effect of a waiver would be to deprive the municipality of its assurance that the

contract will be entered into, performed and guaranteed according to its specified requirements . . . . " Twp. of River Vale v. R. J. Longo Constr. Co., Inc., 127 N.J. Super. 207, 216 (Law Div. 1974).  Stated differently, a defect is material if it goes to the heart of the bidder's ability to perform the contract.  See Palamar Constr., Inc. v. Pennsauken Twp., 196 N.J. Super. 241, 255 (App. Div. 1983).  A condition that does not address the ability of the bidder to perform the contract may nonetheless be deemed material if "it is of such a nature that its waiver would adversely affect competitive bidding by placing a bidder in a position of advantage over other bidders or by otherwise undermining the necessary common standard of competition." Meadowbrook, 138 N.J. at 315 (quoting L. Pucillo, 249 N.J. Super. at 547); see also Suburban Disposal Inc. v. Twp. of Fairfield, 383 N.J. Super. 484, 492 (App. Div. 2006).  Thus, a "bid condition" whose waiver is capable of being a vehicle for corruption or favoritism, or capable of encouraging improvidence, or extravagance, or likely to affect the amount of any bid . . . . are the kind of conditions" that may never be waived.  Suburban, 383 N.J. Super. at  493 (quoting Terminal Constr., 67 N.J. at 412).  In short, the test is "whether waiver of the deviation would thwart the aims of the public bidding laws."  In the Matter of the Protest of the Award of the On-Line Games Production & Operations Contract, 279 N.J. Super. 566, 596 (App. Div. 1995) ( "In re Games").

        In summary, to the extent a bid is challenged for failing to include particular information, the Court must determine: (1) if the bid lacked a material component, i.e. one that impacts the bidder's ability to perform, and (2) whether or not the bid as submitted adversely affected the competitive bidding process by giving the successful bidder an edge over other bidders.  Palamar Constr., 196 N.J. Super. at 256-57.  If the omitted information is material, then the bid is

defective and must be rejected.  If the noncompliance is immaterial, then the decision to grant or

deny waiver is reviewed to determine if the waiver amounts to an abuse of discretion.  In Re

Games, 279 N.J. Super. at 595.

      If a disappointed bidder challenges an governmental authority's finding that a bid as

submitted conforms to the bid specifications, then the standard of review of is "whether the

decision was arbitrary, unreasonable, or capricious."  Id. at 590.

      B. Standing

      To challenge either a waiver of a bid specification or a decision that a bid conforms to the

specification, the challenger must have standing.

        i. Arguments

      Plaintiff argues that it has standing to challenge MCMUA's decision to award the bid to

Waste Management because it is the lowest responsible bidder who did not receive the contract

solely "because of the failure of the MCMUA to properly consider material defects in the Waste

Management bid."  Pl. Br. at 9.  MCMUA concedes that plaintiff "was an unsuccessful bidder in

this matter not because the Authority considered the bid submitted by [plaintiff] to be materially

deficient" and that its bid was not "legally disqualified from consideration by the Authority . . . .

"  MCMUA Br. at 9-10.

      Waste Management asserts, however, that plaintiff lacks standing because "the arguments

advanced by Plaintiff with respect to the disposal capacity/Question [No.] 12b issues and with

respect to Question 16 are and should be self-defeating" because plaintiff's own bid fails to "pass

the litmus tests it claims should be applicable to WMNJ's Bid."  Waste Mgmt. Br. at 35.

Specifically, Waste Management argues that plaintiff's responses to Question No. 12(b) "did not

demonstrate that the two larger of the Disposal Facilities listed in its Bid were 'willing to accept' the quantities of waste necessary to enable Plaintiff to meet . . . daily disposal capacity . . . and annual disposal capacity" and that plaintiff's response to Question No. 17 was deficient because "not all of Plaintiff's listed Disposal Facilities provided responses to Question 17 . . . ." <u>Id.</u> Waste Management contends that "[a] disgruntled Bidder may not challenge the award of a Contract to another Bidder on grounds that defeat its own entitlement to an award." <u>Id.</u> at 36.

A bidder claiming to be entitled to the award of a contract for public work has standing to challenge the rejection of his bid or the award of the contract to another bidder and to compel the award of the contract to him.  <u>See</u> <u>M. A. Stephen Constr. Co. v. Borough of Rumson</u>,125 N.J. Super. 67, 74 (App. Div. 1973).  Standing, however, is conferred to benefit the public interest and therefore does not "create or establish in the bidder . . . a right which, if violated, would render the public agency liable in damages to the bidder."  <u>Id.</u> at 74; <u>see also</u> <u>Saturn Constr. Co. v. Bd. of Chosen Freeholders</u>, 181 N.J. Super. 403, 408 (App. Div. 1981) (noting that "[t]he Supreme Court has stated that an unsuccessful low bidder has standing to challenge 'to the end that the public will obtain all that is due it in the procurement process, rather than for his individual aggrandizement.'")(quoting <u>Trap Rock Indus., Inc. v. Kohl</u>, 59 N.J. 471, 480 (1971)). Moreover, a plaintiff does not have standing if it would not be entitled to the contract if the defendant were disqualified.  <u>Interstate Waste Removal Co. v. Bd. of Comm'rs</u>, 140 N.J. Super. 65, 71 (App. Div. 1976) (finding no standing for the third lowest bidder to "question the responsibility of the lowest bidder" if it would not be entitled to the contract).

For the purpose of these motions, the Court will assume that the plaintiff's bid did not

have any material defects[3] and that the plaintiff would have been entitled to be awarded the contract if Waste Management was disqualified.  The Court will therefore examine each of the claimed defects.

C. Surety

i. Arguments

As to the defect concerning the surety requirement, the plaintiff argues that it is entitled to summary judgment because Waste Management failed to submit a "Consent of Surety in an amount equal to 100% of the total value of the contract (i.e. $190,290,000)" because Waste Management's surety company "has an underwriting limitation of $115,540,000 for surety obligations" and the "Surety forms did not designate any other participating surety companies or re-insurance." Pl. Br. at 4.  Plaintiff further asserts that Waste Management's efforts to address the deficiency after the bids were open was too late to cure the material defect.  Id. at 36.

In response, Waste Management argues that: (1) the plaintiff's arguments have no basis in law or fact; (2) Waste Management's submission was responsive to the bid request and whether or not the insurance company is authorized by the United States Treasury to insure Waste Management's performance does not invalidate its submission; (3) federal law allows the "underwriting of risks on bonds exceeding a Surety's Treasury Limit so long as certain enumerated methods are used to bridge the gap"; and (4) Waste Management complied with the bid requirement by producing a Consent of Surety before the bids were opened.  Waste Mgmt. Br. at 9-12, 25-30.  MCMUA asserts that there was no material defect because: (1) Waste

_____

[3]Plaintiff was the second highest-bidder and the MCMUA had determined before awarding the contract that Plaintiff's bid was "not so defective as to prevent the Authority from evaluating the merits of" it.  MCMUA Br. at 5, 10.

Management submitted the required Consent of Surety with its bid; and (2) the fact that a

satisfactory Surety Disclosure Statement and Certification was submitted after the bid is

inconsequential because it was not due at the time of Waste Management's bid, but rather due

when the contract was awarded.  MCMUA Br. at 12-22.

Plaintiff also argues that: (1) Waste Management's submission of the Consent of Surety

deprived the MCMUA of the assurance that the work would be performed;  (2) the fact that the

pages for the Consent of Surety and Surety Disclosure Statement and Certification are

consecutively numbered on the MCMUA forms show that they were required to be submitted

together at the time of the bid submission;[4] (3) the Consent of Surety form states that "the

Statement of Authority" which plaintiff argues is the Surety Disclosure Statement, is "to be

hereto attached by the surety company;" and (4) the $20,000 "Bid Bond submission of Waste

Management did not have any Surety Disclosure Statement and Certificate attached to it."  Pl. Br.

at 23-34; Pl. Reply Br. at 12-15.

In reply, MCMUA argues that: (1) the fact that the documents in the bid are consecutively

numbered does not show that both the Surety Disclosure statement and the Surety Disclosure

---

[4]  Plaintiff specifically states in regard to the consecutively numbered documents that :

> The MCMUA Specifications specifically instructed the bidders that
> the Consent of Surety was to be submitted "on the forms included in
> the bid documents". . . The Consent of Surety forms included in the
> MCMUA bid documents consisted of four numbered pages with SU-
> 1 of SU-4 being the Consent of Surety, with page SU-2 of SU-4 being
> the applicable Surety Acknowledgment, and with pages SU-3 and
> SU-4 of SU-4 being the Surety Disclosure Statement and Certificate
> . . . Because of the way the pages are numbered . . . there is no doubt
> that all four pages . . . go together and are to be submitted as a packet.

Pl. Br. at 24-25.

Statement and Certification were required to be submitted together at the time of the bid because there is no express language requiring them to do so; (2) the issue regarding the physical attachment of a completed Surety Disclosure Statement and Certification to Waste Management's bid "is irrelevant" because such information is required "only after an award to the lowest responsible bidder . . . ;" (3) a "Consent of Surety is not a bond that can be legally attached to the Surety Disclosure Statement and Certificate;" (4) the specifications in the bid "unequivocally" state that the Consent of Surety form is page SU-1; and (5) plaintiff "ignores the fact that treasury limits identified were with respect to the $20,000 Bid Bond."  MCMUA Br. at 23-34; MCMUA Reply. Br. at 1-3. Waste Management argues that: (1) the bid specifications only refer "to a single page 'Consent of Surety form' which appears on the page, 'SU-1'," and hence the consecutively numbered pages that followed were not part of the document; (2) a Disclosure Statement is meant to be attached to a Performance Bond, after the contract has been awarded, as opposed to being attached to a Consent of Surety; and (3) the Certificate of Authority as referred to in the Consent of Surety form "is the statutorily required and recognized document submitted with [Waste Management's] Bid . . . [and] [i]t is not the Surety Disclosure Statement for a Performance Bond."  Waste Mgmt. Br. at 9-12, 25-30; Waste Mgmt. Reply Br. at 7-9.

　　ii. <u>Analysis</u>

　　New Jersey law requires a bidder to present a Consent of Surety when a bid subject to the Local Public Contracts Law requires a surety bond.  N.J.S.A. 40A:11-22;[5] <u>Meadowbrook</u>, 138

---

[5]Section 40A:11-22 mandates that:

> [w]hen a surety company bond is required in the advertisement or specifications for a contract, every contracting unit shall require from any bidder submitting a bid in accordance with plans, specifications

N.J. at 315.  A Consent of Surety "is a direct undertaking by the bonding company" that guarantees to the governmental entity that, if the contract is awarded to the bidder, then the surety will issue a performance bond.  Id. at 316; L. Pucillo, 73 N.J. at 353; see also Albanese v. Machetto, 7 N.J. Super. 188, 191 (App. Div. 1950) (holding that low bidder's failure to comply with specifications requiring Consent of Surety to be submitted with proposal constituted material defect because omission concerned bidder's ability to carry out obligations under contract to remove garbage); DeSapio Constr., Inc. v. Twp. of Clinton, 276 N.J. Super. 216, 221 (Law Div. 1994) (determining that failure of low bidder to include Consent of Surety with bid deprived municipality of assurance that contract would be fulfilled).  The Consent of Surety, which is the certificate described in Section 40A:11-22, differs from a performance bond.  The Consent of Surety embodies a promise that the surety will provide such a bond if the contract is awarded.  It  is a material requirement because it assures the governmental entity that the contract will be fulfilled.  The Consent of Surety requirement also impacts those who may submit bids as it requires securing the commitment from a bonding company and the obligation to incur the expense associated therewith may deter some potential bidders from participating in the bidding process.  Meadowbrook, 138 N.J. at 317.

Here, the bid specifications states that "[a] Consent of Surety for a Performance and Payment Bond on the forms included in the Bid Documents shall be submitted with the Bid." Stip Ex. 1 at 12.  The plaintiff does not argue that Waste Management did not submit the

---

and advertisements, as provided for by law, a certificate from a surety company stating that it will provide the contractor with a bond in such sum as is required in the advertisement or in the specifications.

N.J.S.A. 40A:11-22.

required Consent of Surety but rather argues that the Surety Disclosure Statement and Certification that Waste Management submitted shows that the Consent of Surety is deficient because the company issuing it did not have the capacity to issue a Consent of Surety for the full value of the contract.  Plaintiff contends that Waste Management's bid is therefore materially deficient.

Plaintiff's argument fails.  First, Waste Management was required only to submit a Consent of Surety at the time of the bid and there is no claim that the four corners of the consent are deficient.  Plaintiff has asked the Court to question the sufficiency of the consent by referring to another document, namely the Surety Disclosure Statement and Certification.  The bond specifications, however, make clear that only a Consent of Surety is required to accompany the bid, Stip. Ex. 1 at NB-3, IB-2,  and the litigants agree and the law provides that the Surety Disclosure Statement and Certification is mandatory only when a performance bond is required. Pl. Br. at 23-25; MCMUA Br. at 13;  Waste Mgmt. Br. at 25-30; N.J.S.A. 2A:44-143.[6]  Thus, since the document was not required at the time of the bid's submission, its presence and its contents at the time of the bid's opening could not be viewed as creating a material defect.

 Second, plaintiff's effort to convert the submission of the Surety Disclosure Statement and Certification into a required document also fails.  The mere fact that the Consent of Surety

---

[6]N.J.S.A. 2A:44-143 states that:

> [a] board, officer or agent contracting on behalf of the State, contracting unit or school district shall not accept a payment or performance bond unless there is attached thereto a Surety Disclosure Statement and Certification to which each surety executing the bond shall have subscribed. This statement and certification shall be complete in all respects and duly acknowledged according to law. . . .

N.J.S.A. 2A:44-143.

and the Surety Disclosure Statement are consecutively paginated does not change the separate

purposes each serve and the timing when they are to be submitted.  As the New Jersey Supreme

Court observed in Meadowbrook, the "certificate from a surety company, referred to as a

Consent of Surety, assures the public entity that the surety will provide the performance bond if

the contract is awarded to and signed by the bidder."  138 N.J. 307, 313 (1994)(emphasis added)

(quoting L. Pucillo, 73 N.J. at 353).  Thus, the Consent of Surety embodies a guarantee to

provide a performance bond if the contract is awarded and hence is to be submitted when the bid

is presented.  According the bid specifications, the Surety Disclosure Statement and Certificate is

to be attached to the performance bond itself.  Stip. Ex. 8 at 10-22.  Since the performance bond

is not secured until after the contract is awarded, there would be no bond to which the Surety

Disclosure Statement and Certificate would be attached when the bid is submitted.  Thus, the

document itself makes clear that it is not meant to accompany the bid and thus, is not intended to

be completed at the time when the bid is submitted.

        This is not to say that the document is not material as it must accompany a performance

bond.  Indeed, execution of the "contract is contingent upon the furnishing of an executed

Performance and Payment bond. . . ." Stip. Ex. No. 1 at 12-13.  Thus, once the bid is awarded,

the winning bidder must furnish the bond and the Surety Disclosure Statement and Certification

so that the governmental entity is assured that if the bidder fails to perform that the surety has the

means to pay the entire contract amount.  Thus, at the time of the bid, the governmental authority

needs an assurance that a surety is willing to guarantee the bidder's performance.  Once the bid is

awarded, then the surety fulfills its guarantee by providing a performance bond and proof it can

pay the amount of the bond.

Third, even if considered, the contents of the Disclosure Statement and Certification would not warrant a finding that the bid contains a material defect. A superficial comparison of the Consent of Surety and the Disclosure Statement and Certification suggests that the surety lacked the financial wherewithal to guarantee to full amount of the contract. The Consent of Surety guarantees 100% of the value of the contract if it is awarded, which was $190,290,000, but the Disclosure Statement reflects that the Surety's underwriting limit was $119,787,000. Stip. Ex. No. 8 at 10-6. At a glance, this would suggest that the surety could not satisfy the full amount of the contract. The Disclosure Statement and Certification, however, addressed only the surety's limits, but made no mention of any excess coverage to which it had access. At the time of the bid, however, only the identity of the surety was required to be disclosed. There was then no need to present information about its underwriting limits or reinsurers so it is understandable why Waste Management only provided information about its surety and that it provided no information about its surety's reinsurers with the bid. Information about the role of the reinsurers was presented on January 8, 2008. While this information cannot be used to "correct" an alleged defect in the bid, it demonstrates that the bid simply failed to disclose that three of the surety's companies intended to guarantee performance. Interestingly, had their identities been disclosed with the bid, it is likely that it would have made the bid more attractive and hence their omission did not give Waste Management a competitive advantage. Thus, the difference between the documents does not support the contention that the Consent of Surety was defective.

Finally, not only was the information on the Surety Disclosure Statement and Certification not required at the time of the bid, but the difference between the surety's guaranteed amount and its underwriting limit as disclosed in the statement did not render the bid

defective.  Federal law allows a surety to exceed its own underwriting limitation so long as it is "reinsured within 45 days from the date of execution and delivery of the bond . . ." 31 C.F.R. § 223.11.  Thus, the law allows a surety to guarantee performance above its limits but requires it to obtain reinsurance within a specified time-frame after the bond is executed.  Therefore, the fact the disclosure statement shows that the surety alone could not fulfill the contract price does not render the bid nonconforming.

For these reasons, the decision to accept the Consent of Surety was not unreasonable, arbitrary, or capricious.

D. Question No. 12(b)

i. Arguments

Plaintiff also contends that Waste Management failed to demonstrate it had "the capacity to dispose of 500,000 tons of County solid waste per year" because Question No. 12(b) in the Landfill Questionnaire, which asks the bidder to "demonstrate that the five landfills are willing to accept MCMUA waste from Waste Management," was left blank.  Pl. Br. at 3, 11.

In response, Waste Management concedes that the answer to Question No. 12(b) was omitted, but argues that: (1) such a omission was immaterial and thus waiveable; (2) the biding requirement did not mandate that Waste Management prove it had a commitment that its disposal facilities were able to receive the waste from Waste Management; (3) the omission had no bearing on its ability to fulfill the contract; (4) the MCMUA exercised appropriate discretion to waive it; (5) Waste Management's bid was sufficient to show that it had the capacity to dispose of the MCMUA's waste; (6) its failure to answer Question No. 12(b) "did not deprive the MCMUA of its assurance that the contract would be fully and faithfully performed;" and (7)

-22-

plaintiff's was not "competitively disadvantaged" by the omission.  Waste Mgmt. Br. at 6-9, 17-24.

MCMUA responds that: (1) the answer to this question is immaterial because the answer to this question does not give the MCMUA the assurance that the contract will be performed; (2) Question No. 12(b) is not designed to seek such assurances; (3) other questions in the bid are designed to secure assurances that the contract will be performed; (4) Waste Management's failure to answer Question No. 12(b) did not result in a material disadvantage to plaintiff; (5) the MCMUA has the discretion to require bidders to secure commitments from landfills that permit the disposal of the waste; and (6) any defect here was not material and thus waivable.  MCMUA Br. at 22-36.

In reply, the plaintiff argues that the defects in Waste Management's bid are: (1) material and nonwaivable; (2) the bid specifications established the 500,000 tons per year requirement was "as a mandatory 'pre-qualifier' that cannot be ignored; and (3) the failure to answer Question No. 12(b) deprived the MCMUA of the assurance that the contract will be performed.  Pl. Reply Br. at 1-12.

MCMUA asserts that the guarantee by Waste Management's parent corporation in its answer to Question No. 12(a) that it had the capacity to dispose of the waste was sufficient to give the MCMUA the assurance that the contract would be performed.  MCMUA Reply Br. at 4-6.  Waste Management replies that: (1) "whether or not a Bidder satisfactorily demonstrated disposal capacity was a discretionary judgemnt be made by MCMUA, not a Court"; and (2) plaintiff's concession in regard to "the non-binding and, thus, changeable nature of the omitted information in [Waste Management's] Bid" makes plaintiff's materiality argument "inconsistent"

and "nonsensical".  Waste Mgmt. Reply Br. at 2-7.

     ii. <u>Analysis</u>

Waste Management did not answer Question No. 12(b) of the Landfill Facility

Questionnaire.  Stip. Ex. No. 8 at Add-7, and by awarding the contract to Waste Management,

MCMUA waived the omission.  Waste Management's failure to answer 12(b) in the Landfill

Facility Questionnaire, however, does not present a non-waivable material defect in its bid

submission.  First, there is nothing in the record showing that a bidder must provide an answer to

this question.  The Landfill Facility Questionnaire states at the top of the first page: "[t]his

Landfill Questionnaire shall be photocopied and completed for each Landfill Facility proposed by

Bidder to be used as an Approved Disposal Facility.  An incomplete response to a question <u>may</u>

result in a bid being non-responsive."  Stip. Ex. No. 8 at 10-22 (emphasis added); Stip Ex. No. 8

at Add 6.  The instructions therefore make clear that an answer to each question was not

mandatory and hence was not viewed as the type of information essential to assuring the

MCMUA that the bidder could perform the contract.  As such, the lack of response to this

question does not automatically invalidate Waste Management's bid.

Second, even if Question No. 12(b) was viewed as seeking information essential to

evaluate a bidder's ability to perform the contract, the failure to answer Question No. 12(b) does

not amount to a material defect because the bidder provided information elsewhere in the bid.

Question No. 12(b) asks for the anticipated tonnage that will be disposed of at the landfill

facility.  Stip. Ex. No. 1.  The purpose of the Landfill Questionnaire, and this question in

particular, is to ascertain the approximate amount of waste each facility may receive from

MCMUA to ensure that the bidder has a place to appropriately dispose of waste.  To this end,

-24-

Waste Management provided Questionnaires from Grows North Landfill, Tullytown Resource Recovery Facility, Alliance Sanitary Landfill, Inc., Grand Central Sanitary Landfill, Inc., and Keystone Sanitary Landfill.  Stip Exhibit No. 8.  Question No. 12(a) asks for the maximum and average daily permitted quantities, in tons, of solid waste each facility may accept.  Id.  Each Landfill Facility answered Question No. 12(a), and their answers reflect that the five facilities are permitted to receive the following amounts of daily waste, in tonnage, respectively: 10,000, 10,000, 5,500, 3,000, and 5,000.  Id.  Moreover, the record indicates that Waste Management owns three of these facilities, Grows, Tullytown, and Grand Central, and thus has under its direct management the ability to receive 23,000 tons of solid waste per day and together have the capacity under their current permits to accept 15,200,000, 1,300,000, and 442,800 tons in disposal capacity.  See Stip. Ex. 8 at 10-22, response to Question No. 13.  Therefore, the answers to the Questionnaire reveal that the facilities are permitted to receive 33,500 tons of waste per day, and hence have the capacity to receive 2,500 tons of waste from MCMUA per day, and together the facilities have the ability to handle more than thirteen times that amount per day.  Id.  Thus, there is sufficient information in the Questionnaire to assure the MCMUA that Waste Management has the capacity to dispose of the waste and the absence of an answer to Question No. 12(b) is not a material omission in Waste Management's submission.

Third, the plaintiff has not shown that omitting an answer to Question No. 12(b) adversely affected the competitive bidding by placing Waste Management in a position of advantage over other bidders or otherwise undermined the necessary common standard of competition.  The plaintiff has submitted no evidence that Waste Management enjoyed a competitive advantage over it by not answering Question No. 12(b).  Waste Management provided information that enabled MCMUA to evaluate the permitted activities and available disposal capacity at each of the five landfills through answers to other questions in the Landfill

Questionnaire, Waste Management also disclosed its ownership interest in three of the entities

and thereby demonstrated its control over them.  Failing to provide an estimate of the amount of

Morris County waste it may deliver to a particular facility did not provide it any competitive

advantage given Waste Management's identification of the five landfills that could handle the

tonnage and Waste Management's control over three of them, which together allowed the

MCMUA to evaluate if the bidder could fulfill its responsibility to safely remove and dispose of

the waste.  As such, there is nothing before the Court to suggest that waiving the answer to

Question No. 12(b) resulted in a material competitive advantage to Waste Management and the

MCMUA's decision to waive the omission was not an abuse of discretion.

     E. <u>Answer to Question No. 16</u>

        i. <u>Arguments</u>

The plaintiff alleges that Waste Management's bid was defective because "none of the

four transportation subcontractors listed in the Waste Management bid completed and submitted

the mandatory Questionnaire. . . [which the bid specifications] specifically state . . . must be

submitted 'by the bidder and any proposed subcontractors.'" <u>See</u> Pl's Br. at 34-37.

In response, Waste Management argues that: (1) plaintiff seeks to add a requirement that

the bid request does not impose; (2) Waste Management complied with the bid request by listing

at least one occasion where it had transported an average of 1,000 tons of waste per day; (3)

plaintiff's own bid did not comport with the interpretation of the requirement that the plaintiff

seeks to impose upon Waste Management; and (4) its "response fully conformed to the plain

language in Question 16" because the specifications did not require "a description of the

experience of each and every one of  [Waste Management's] transportation subcontractors".

Waste Mgmt. Br. at 12-13, 30-32.

MCMUA asserts that: (1) Waste Management answered the question by listing four

occasions "where the Bidder . . . has transported solid waste with an average daily tonnage of at

least one thousand (1,000) tons per day," even though the question only required the bidder to

provide one such occasion; (2) Waste Management submitted a clarification letter on January 8,

2008, which provided  "the name of the subcontractor transporter as Gary W. Gray

Transportation for work performed for the Authority since 1995"; and (3) the answer to this

question is immaterial.  MCMUA Br. at 36-38.

ii. <u>Analysis</u>

The record indicates that Waste Management's answer to Question No. 16 is sufficient.

The instructions on the Questionnaire states that "[t]his [Q]uestionnaire must be filled out and

submitted by the Bidder and any proposed subcontractors as part of the Bid for MCMUA.

Failure to complete this form or to provide any of the information required herein <u>shall</u> result in

rejection of the bid."  Stip Ex. No. 8 (emphasis added).  Thus, unlike the Landfill Questionnaire,

the bidder must respond to all questions in this Questionnaire.  Question No. 16 asks the bidder

to "[l]ist at least one occasion where the Bidder, Bidder's parent entity, <u>or</u> subcontractor, if

applicable, has transported solid waste with an average daily tonnage of at least one thousand

(1,000) tons per day between two validly permitted Disposal Facilities."  <u>Id.</u> (emphasis added).

In its answer to this question, Waste Management identified more than one occasion when it

transported solid waste with an average daily tonnage of at least one thousand tons per day

between two validly permitted disposal facilities.  Specifically, Waste Management listed the

following companies for which transportation work was previously performed: (1) Morris

County Utilities Authority; (2) Mercer County Improvement Authority; and (3) Bergen County

Utilities Authority.  Stip. Ex. No. 8 at 10.  It identified the contact person, described the work

performed, the amount transported, the years the service was performed, and the disposal

facilities to which the waste was transported.  Although the face of the answer did not specify if

the bidder, its parent, or subcontractor performed the work, the omission does not present a material defect to Waste Managements's bid.  First, the question asks to "[l]ist at least one occasion where the Bidder, Bidder's parent entity, or subcontractor, if applicable, has transported solid waste with an average daily tonnage of at least one thousand (1,000) tons per day between two validly permitted Disposal Facilities."  Stip. Ex. No. 1 (emphasis added).  The question does not ask for the identity of who among the bidder, its parent or subcontractor, performed the work. Second, the question is written in the disjunctive and requires only one occasion where the bidder, or its parent, or subcontractor, transported at least 1000 tons of waste.  Thus, while other questions on the Questionnaire are meant to secure answers from the bidder and proposed subcontractors for the new contract, Question No. 16 is looking for prior work performed by either the bidder or subcontractor.[7]

Moreover, although the introductory language of the question states that "[t]his [Q]uestionnaire must be filled out and submitted by the Bidder and any proposed subcontractors as part of the Bid for MCMUA," not all questions in the Questionnaire require an answer from a subcontractor. Id.  For example, Question No. 13 asks for bank references from the bidders. Id. Neither the plaintiff, nor Waste Management, submitted in their answers to Question No. 13 bank references for their subcontractors.  See Stip. Ex. Nos. 8-9.  Rather, each submitted bank references on behalf of themselves.  Id.  Question No. 16 similarly need not be answered by Waste Management's transportation subcontractors because it only asks Waste Management to provide information about "the Bidder, Bidder's parent entity, or subcontractor" concerning previous solid waste transportation services performed.  See Stip. Ex. No. 4 (emphasis added).

---

[7]While a reader may reasonably conclude that the bidder, Waste Management, performed all of the occasions listed, the January 8, 2008 letter states that transportation activities of at least one of its subcontractors was also included in the bid.  Stip. Ex. No. 17 at 3.

By providing information about itself, Waste Management responded to the question posed. Therefore, its response to Question No. 16 is not defective, materially or otherwise.

Thus, the decision to accept the response as conforming to the bid specification was not unreasonable, arbitrary, or capricious.

## V. CONCLUSION

For the foregoing reasons, it is recommended that the United States District Judge grant the defendants' cross-motion for summary judgment and deny plaintiff's motion for summary judgment.  The parties have ten days to file any objections to this Report and Recommendation.

Respectfully submitted,

s/Patty Shwartz
_____
**UNITED STATES MAGISTRATE JUDGE**

Date: October 17, 2008